Our next case is Sweet Additions Ingredient Processors, LLC v. Meelunie America, Inc. Good morning and may it please the court. I'm Corey Morrow here on behalf of Sweet Additions. I'm joined by Eric Barton Hagan and the president of Sweet Additions, Kenneth Valdivia is here as well. I'd like to reserve four minutes. I see that it's on the clock. Our first issue, I'm going to jump right into it, is incorporation by reference. Sweet Additions entered into a contract where Meelunie agreed to supply tapioca starch to Sweet Additions. There were no terms and conditions attached to that contract when it was negotiated, when it was executed. My client never saw them until the litigation, but nonetheless, on summary judgment, the trial court found that the terms and conditions were incorporated by reference. Can I ask you a quick question? I'm sorry. No, no, go ahead. Just so I'm clear, you said your client never saw them to litigation. Am I wrong in understanding that they were attached to invoices sent to your client both before and after? You are positively not wrong about that. How is it that you can say your client never saw them to litigation? Sure. The affidavit in support of summary judgment testifies, Sweet Additions testifies, that Kenneth Valdivia, the decision maker, the person who had authority to enter into contracts and accept the offer, did not see the invoices, I'm sorry, the terms and conditions until this litigation. But is that on them or on you? The fact that your guy didn't see things that they attached to emails that they sent to you? Sure. The delivery is certainly the most harped upon fact in Maluni's brief. They sent the terms and conditions by emails quite remote from the time of execution and negotiation of the contract. So the closest in time emails are in August, and the contract is entered into in September. So a couple months before the execution of the contract, and then the next one is in February of the next year. So months after execution of the contract. Did you pay 18% interest on outstanding amounts? Interest was paid, absolutely. Right. And where in the contract does it say that you will be paying 18% interest? In the terms and conditions.  However... Well, wouldn't it be strange for you to pay 18% interest if it's not in the contract, if you didn't know that it was in the terms and conditions? Well, the party certainly discussed the payment of interest separate and apart from those emails. I think the point relative to incorporation by reference, however, is that the emails attaching the terms and conditions don't reference the contract. They don't attach the terms and conditions to the contract. And again, going back to the moment... I'm sorry, you said they don't. Okay, so the contract itself says to you, we herewith confirm having sold to you on our general conditions. And then a second time, and this is just a one-page contract, on all our sales contracts, our general sales conditions apply. A copy of these conditions can be obtained upon request. So it says it twice in a one-page document. Yes. And I don't want to stop you, Your Honor. No, go ahead. Sure. So you're absolutely correct. It says it twice in a one-page document. That speaks to whether it's a conspicuous, noticeable provision. The test, in terms of incorporation by reference, does not speak to conspicuousness. That's certainly a factor that the courts consider. But the test is, is the language itself, does it make it subject to the collateral document, right? Are we agreeing to abide by and accept the terms of the collateral document? And then the second prong is, is that collateral document adequately sufficiently described? So, respectfully, the fact that it appears twice, and there's two references within a one-page document, that's certainly a factor that goes to conspicuousness. What do you do with avatar properties, especially given that you paid the 18% interest that appeared only in the terms and conditions? Well, I think avatar is distinguishable. You know, the buyer initials the paragraph in that case. I think there's more conspicuous, more clear language and a more sufficient description. So, accepting the paragraph is more of an indication that you're accepting the terms and conditions that you don't have than paying 18% interest? I mean, how does that work? Sure. The emails, again, don't have any relationship or they're entirely remote from the execution and negotiation of the contract itself. Back to the test, we're looking at intent. Judge Marcus recently wrote in the Calderon decision, the key issue in this body of law is to glean intent. The contract must evidence intent to be bound. So, we're looking at both the language and the circumstances of incorporation to determine whether there was agreement in that regard. And in this instance, when you- But what intent are we supposed to infer from the fact that, as Judge Rosenbaum pointed out, the reference is made twice to a very specific collateral document? It's not even a general reference because if you look at the back end of the agreement, it capitalizes general sales condition and a copy of these conditions can be obtained upon request. Why doesn't that suggest intent right there? Sure. A couple of things. You have two descriptions. One is general conditions. Both letters, both first letters are not capitalized. That's not how we refer to documents. We refer to documents with capital letters. And then the next reference is general sales conditions. So, two totally different references, right? But when you look at the document that was actually incorporated by reference, it bears an entirely different title. It's called capital T terms, capital C conditions of sale. How different is the phrase conditions of sale from our general sales conditions? Well, they're very different. Turn the order around, but where's the difference? Tell me. They're very different. General sales conditions on the one hand, and terms and conditions of sale. There's some difference. They add the word terms. Add the word terms. One is capitalized, and so we understand it to refer to a document, whereas general conditions, uncapitalized, refers to general conditions, not a document. Of course, they capitalize general and sales at the back end. They do, but when you look at general sales, that doesn't appear in the collateral document. It's terms and conditions of sale. So, we have three descriptions between the agreement itself and then the collateral document, none of which match. Can I ask you, maybe, maybe it's a favor, but you've got another argument. I do. For my purposes, I'd like to hear your position on that. It is a favor. Maybe it's a favor to you. Yeah, right. The second argument is exclusion of remedies. These terms and conditions, if we're going to assume that they apply, the UCC tells us a couple important things. It says in the comments that parties must accept the legal consequence under the UCC of at least a fair quantum of remedy, and further, that the essence of a sales contract is that at least a minimum adequate remedy be available. That's why we contract. That's why we bother to enter into agreements. And further still, the UCC requires courts to liberally administer the provisions that we're about to talk about to the end that the aggrieved party is put as in good a position as if the other side fully performed. Now, several provisions of the Michigan UCC are dead on point here. 2711 tells us that where there's a failure to deliver, a buyer can have cover damages. And 2712 tells us that for non-delivery, you can see cover damages together with incidental and consequential damages. But just so I understand, it's not your position that the UCC is sort of like binding in the sense that it makes this right to direct cover damages unwaivable. It's just that that's the background law against which you read the contract in this case. The parties presumably could contract for any old thing they want to. Your position is given the background of the UCC, the parties' contract here isn't sufficiently clear to countermand the UCC background rule. Is that it? The last paragraph of the terms and conditions states that the UCC applies, it governs, and all definitions and terms here shall be interpreted within the UCC. And to your point, 2719 acknowledges that we can agree to limited remedies, and you can even have exclusive remedies. But where the circumstances cause that remedy to fail, we default back to cover. Applied here, as an aggrieved party, we're entitled to some basic remedy. And in these circumstances, the purported exclusive remedy is to repair and replace. If nothing was delivered in the first place, which is our contention, our claim, then there's nothing to repair and replace. And that's a classic example of an exclusive remedy failing to serve its essential purpose. I'm going to read from my opposition's brief. They say because the circumstances here do not allow Sweet Additions to use the exclusive remedy that it contracted for does not mean that Sweet Additions has no remedy. That's exactly what it means, though, because if you can't use the exclusive remedy, and that is a point that they concede in their brief, then it fails to serve its essential purpose. We've provided case law in this regard. I don't have time to go through it. But the UCC, I think, does exactly what is required to be done here, which is to afford us a basic minimum remedy. And in this instance, it's cover. For all these reasons, I do have some time on rebuttal, talk about a few other things. But for all these reasons, we ask that you... Of course. And that's where I was going. But for all these reasons, we ask that you reverse summary judgment on the incorporation by reference issue. We also ask that you reverse the trial court's holding that the terms and conditions may exclude all remedies for Maloney's failure to deliver the tapioca starch. Thank you. All right. Thank you, Mr. Morrow. We'll hear next from Mr. Parzianiello. May it please the court. Derek Parzianiello on behalf of Maloney America. The district court correctly ruled on the two major issues that were addressed in Mr. Morrow's argument. And that is that pursuant to this court's recent decision in Calderon, the terms and conditions were incorporated into the party's contract. And that as a result, under Michigan law, suite additions contracted for the exclusion of damages for the cost of substituted product in exchange for the contract. Yeah. So it seems to me like you may have a problem on the second issue. And the reason is because the way it seems like you're asking us to read this is to effectively prevent any remedy at all here. And if that's the case, that's a problem. Why isn't that the case? Well, I think there's a difference between a remedy and damages for that remedy. Suite additions had... What is the remedy then? The remedy could have been that they seek specific performance of the contract. I'm not sure I agree with that because that really seems to me to... First of all, it seems to be contrary to the language of the agreement. The terms and conditions that are in here say nothing about direct damages or which cover damages. An aspect of covered damages is direct damages. It's not... Excuse me. It's not necessarily consequential, special, incidental, or exemplary damages. So would you like to address that? Sure. I think that the actual words cost of substitute product, whether it's deemed direct, consequential, or otherwise, covers the definition here of cover. They could not... Well, that's not what the UCC says. The UCC makes a clean distinction between direct and consequential damages. Direct damages are those that flow directly from the buyer's breach. And consequential damages don't arise within the scope of the immediate buyer-seller transaction. Instead, they stem from losses that are incurred by the non-breaching party in its dealings, usually with third parties, that were approximate result of the breach and that were reasonably foreseeable by the breaching party at the time of contracting. So cover costs are direct damages and Section 2712 of the Code permits a plaintiff to cover in any commercially reasonable manner in the marketplace to secure alternative goods or services necessitated by the breach of contract. And those are categorically distinct from consequential or incidental damages. Why is that not a correct interpretation of Michigan law? Because under Michigan law, the parties are free to limit as they wish the measure of recoverable damages. They are, but just because they are doesn't mean you did it. And it still has to be a contract that's not illusory, that's got consideration on both sides. They had their remedies, as I mentioned, they could have canceled the contract, they could have sought... How does canceling the contract help them? It doesn't get them damages because they contracted that away. They could, as they did... But again, maybe we should start with they contracted that away. What language in here contracts away direct cover costs? I believe the exact language cost of substitute products. But aren't you sort of snatching that out of context? I mean, I tend to agree with you that if that's the only language we had, that does sound like what I'll call like substantive direct cover costs. But read in the context of the entire provision, where you're talking about special, consequential, incidental, or exemplary. And then every other item in the list is what we would call an incidental damage item. Why wouldn't we likewise read cost of substitute products to mean the incidental costs associated with covering? Especially against the backdrop of the UCC, as Judge Riff Obama said. Well, against the backdrop of the UCC, as cited in our brief, it permits the contract in the way of damages. But as to that specific clause, I don't think there's... Well, I don't think there's an ambiguity that it's trying to exclude all types of these incidental, direct, exemplary, consequential damages, including cost of substitute product. I think that... I don't think there's an ambiguity there. I think I might be more persuaded if the introductory clause referred, and I'm just eyeballing it here to make sure that I'm not going to stick my foot in my mouth, but to direct. But it says Maloney shall not be in any event liable, whether as a result of breach of contract, warranty, or tort, including negligence or other grounds, for special, consequential, incidental, or exemplary damages, including but not limited to. And then a list of items, all of which I would kind of put in the incidental category, and cost of substitute product. Could it have been worded differently? Yes. Does the direct reference to cost of substitute products put them on notice that cover is unavailable? I believe yes. And to the extent that there was any ambiguity or an attempt to explain... We read it against you, right? I mean, to the extent that there's any ambiguity, we would read it against you as a drafter, wouldn't we? Well, no. Actually, the law provides that they didn't read the contract. They said that they didn't read the contract, so they essentially have waived any arguments regarding the explanation or notification of the provisions of the contract. Let me ask you, under your reading, how does that reading give them the benefit of their bargain? And I ask that because, as I understand it, the reason that they entered into the contract was to lock in the price, right? That was the part that they were looking for. And then when you cancel, now their price isn't locked in, they don't have the product. And now, instead of being able to find somebody else to lock a price in at the same time that they would have done it previously, they don't have that available, so now they're going to have to pay a higher price. How does that give them the benefit of the bargain, the way that you've construed the language of the terms and conditions? Well, the benefit of the bargain, and whether there was a breach by Miluni, was never reached by the trial court, but their benefit of the bargain was to be able to go get substitute product. I'm sorry, I'm still not understanding. How does that give them the benefit of the bargain? What they contracted for, as I understand it, maybe I'm misunderstanding, and you can tell me if you think I'm getting it wrong, but as I understand it, what they contracted for was a lock-in of the price. They were getting a certain price, that's why they were going ahead and doing it early and agreeing to go with you. They were bearing the risk of, well, maybe the price is going to drop in future months, but we're still locked in here. And the benefit you were getting was you were going to get that price even if the price dropped. And so instead, what happens is the bargain, the contract gets breached, and now they can't go back in time to get the price that they had contracted for before. How are they getting the benefit of the bargain? Well, just a slight correction, there was no finding that the contract had been breached. There were supply chain issues that all suppliers at the time were experiencing. And what Sweet Additions did was essentially go to our supplier of the product to obtain it in May when we also had it at the same time. So they tried to take us out of the equation. So their benefit of the bargain, if we go back to reaching those issues of breach or non-breach related to, they could have continued to get product from us at the same time that they obtained it from Ubon, who was essentially the original supplier. So could they have gotten the benefit of the bargain at the same time that they eventually did from us? Yes, but they didn't want to. They wanted to avoid paying us the million. So I'm sorry, I'm just a little bit confused. They were seeking the product at a certain time. You said you weren't able to provide it at that time. Am I confused about those facts? That's accurate. Okay. So, and I understand, regardless of what the reason was for why you couldn't provide it. The fact is, the bargain that they were seeking was getting that product at that time. They weren't able to do it. And so they had to make arrangements with somebody else. Isn't that right? They made arrangements with somebody else. And then contemporaneously, they could have gotten that product from us. So they chose not to do that because they owed us over a million dollars in invoices, which they didn't want to pay. And that's the judgment that we received in the district court. And that's a different matter, of course. That's not something we consider in whether you breached the contract. And if you did, whether the terms and conditions allowed them to recover any kinds of damages. And again, we never reached the finding or the conclusion by the district court that there had been any breach whatsoever. The district court simply found that cost of substitute product damages were not available. So do we need to send it back down? And I'm not saying this is what we're going to find. I'm just trying to explore what, you know, different avenues here. If we were to find that they would be entitled to certain limited cover damages under the terms and conditions, if there was a breach, do we need to send it back down to the district court to determine whether there was a breach? Yes, because we never reached that issue. I think the exact wording of the district court was even assuming there was a breach. So we never reached the issue of whether there were legitimate reasons for the delay, which there were in the supply chain due to COVID issues. So in short, I think we've reached the issue of applicability of the terms and conditions, assuming that it's our position that the district court also got it right on unavailability of cost of substitute product. And we ask this court to affirm both parts of the district court's ruling. Thank you, Mr. Parzianello. Mr. Morrow, you have four minutes left. Thank you. I heard counsel say that the provision could have been worded better. I think that must be interpreted against them, right? They are the drafter of the provision. And when you look at the lead-in sentence to the provision we're talking about, it says Maloney's liability shall not exceed the price allowable for such goods. So right off the bat, it appears to contemplate cover damages and then goes on to snatch it back. When you look back at that language, cost of substitute products, and Judge Newsom, you alluded to this, word is known by the company it keeps, right? And everything in that list should be interpreted, since it follows the phrase including but not limited to, should be interpreted as consequential damages. Because the UCC makes a sharp distinction between cover damages on the one hand and consequential and incidental damages on the other, it would be inappropriate to conclude that the term cost of substitute products means cover damages and excludes them. We've cited authority in our reply brief, particularly the Hawaiian case, the systems case, which was part of our supplemental authority. These cases acknowledge that when a remedy, an exclusive remedy, fails in application to the case before the court, I heard counsel say something to the effect of, well, the remedy could have been invoked. That's not the test. The test is based on the facts in this case. Does the remedy apply? Does it afford the benefit of the bargain to the parties? And it's very clear that a repair and replace remedy doesn't do anything for sweet additions where the product hasn't been delivered in the first place. Does the court have any questions? All right. Thank you, counsel. Thank you.